UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

DELIVETRICK DEWON BLOCKER,   )
   )
   *Petitioner,*   )
v.   )   No. 1:04-cv-032
   )   *Edgar*
VIRGINIA LEWIS, Warden,   )
   )
   *Respondent.*   )

## M E M O R A N D U M

Delivertrick Dewon Blocker ("Blocker" or "petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Court File No.3]. Virginia Lewis ("respondent"), Warden of the facility where Blocker is housed, filed a motion to dismiss and for summary judgment [Court File No. 7].

After considering the filings of respondent and petitioner, the record of the state proceedings, and the applicable law, the Court will **GRANT** respondent's motion to dismiss and for summary judgment [Court File No. 7] and **DENY** petitioner's § 2254 petition [Court File No. 3].

In 1996 Blocker was convicted by a jury of felony murder and especially aggravated robbery.[1] He now petitions this Court for review of those convictions. He bases his effort for relief on claims of denial of his constitutional right to effective assistance of counsel, due process, and a fair trial.

## I.   NON-DISPOSITIVE MOTIONS

---

[1] On direct appeal the appellate court modified the conviction to attempted especially aggravated robbery.

1

Petitioner's motion to amend has not been opposed and thus, will be **GRANTED** [Court File No. 10]. Petitioner's motions for appointment of counsel [Court File Nos. 11, 14] and motions for evidentiary hearing [Court File Nos. 12, 15] will be **DENIED as MOOT.** Petitioner's motion for enlargement of time to respond to respondent's motion to dismiss [Court File No.13] will be **DENIED** as untimely.[2] In addition to petitioner's five-page amendment, Blocker's habeas petition and supporting brief are over forty pages which includes a detailed analysis of each claim raised in the habeas petition. Furthermore, the Court has reviewed the entire state court record before it and must base its decision on the state court record and federal law.

## II.    STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the RULES GOVERNING SECTION 2254 PROCEEDINGS IN THE UNITED STATES DISTRICTS COURTS, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing.

Federal courts, pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review decisions of the state courts. This statute

---

[2]    Respondent filed a motion to dismiss on May 10, 2004. Pursuant to LR 7.1, petitioner had twenty days in which to respond to said dispositive motion. Petitioner did not mail his motion requesting an extension of time to respond to the dispositive motion until after the time in which he was allowed to respond had expired. Petitioner mailed his motion for enlargement of time on June 25, 2004; thus, it is untimely.

limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (2).

Ordinarily when state courts issue orders denying relief without discussing the applicable law, this Court must "'conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Brown v. Pitcher*, 19 Fed.Appx. 154 (6th Cir.2001) (unpublished table decision), *available in* 2001 WL 700858, at *2, *cert. denied,* 534 U.S. 1057 (2001) (*quoting Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). "'That independent review, however, is not a full, *de novo*, review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'" *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001), *cert. denied,* 534 U.S. 828 (2001)(*quoting Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001)). Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990).

### III. PROCEDURAL HISTORY

Petitioner was indicted on charges of first-degree murder, especially aggravated robbery, and conspiracy to commit especially aggravated robbery. At the time of the commission of the crimes petitioner was seventeen years of age. He was indicted with two co-defendants, Calvin Trammell and Robert Blocker, petitioner's cousin. A transfer hearing in Hamilton County Juvenile Court on December 21, 1995, resulted in the case being transferred to Hamilton County Criminal Court. Petitioner was convicted of felony murder and especially aggravated robbery by a jury on December 5, 1996. Petitioner was sentenced by the jury to life without parole on the murder charge, and the court imposed a consecutive sentence of twenty-two years, as a standard offender, for the robbery charge.

Petitioner's timely motion for new trial was denied on April 14, 1997. Petitioner then filed a direct appeal to the Tennessee Court of Criminal Appeals. On March 10, 1999, the appellate court affirmed the murder conviction and sentence, and modified the conviction and sentence on the especially aggravated robbery charge. The especially aggravated robbery charge was reduced to attempt to commit especially aggravated robbery and his twenty-two year sentence was reduced to nine years. Permission to appeal to the Tennessee Supreme Court was denied on October 4, 1999.

Petitioner filed a *pro se* petition for state post-conviction relief in Hamilton County Criminal Court on April 25, 2000. After a hearing on petitioner's state post-conviction petition, the state post-conviction court dismissed the petition on November 30, 2001. On March 10, 2003, the appellate court affirmed the state post-conviction court's denial of relief. Petitioner's application for permission to appeal was denied by the Tennessee Supreme Court on January 22, 2004.

## IV.    FACTUAL BACKGROUND

The facts of the crime will be taken from the appellate court's opinion on direct review.  The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.

### A.    Facts from Criminal Trial

The facts as to the convictions which are before this Court are taken from the appellate court's opinion affirming the murder conviction and modifying the conviction and sentence of the especially aggravated robbery charge:

> In this case, the proof at trial showed that Defendant and his severed co-defendants, cousin Robert Blocker and Calvin Trammell, who were all juveniles at the time of this crime, called for a taxicab from a Hamilton County convenience store.  When it arrived, they instructed the driver to take them approximately one-half mile, to a location that the State characterized as wooded and secluded, along a street with several vacant homes.  As the perpetrators exited the car, Defendant heard Robert Blocker demand money from the driver, who reached over between the seats.  Defendant told police that he believed the driver was reaching for a gun, so he pulled a sawed-off shotgun from his pants and pointed it at the driver.  He then shot the driver at a range between six and twelve inches from his head.  All three perpetrators fled the scene, and an area homeowner discovered the victim when the taxicab crashed into her patio.
>
> At Defendant's suppression hearing in the Juvenile Court for Hamilton County, the judge heard testimony for the State from Detective Tim Carroll, who stated that he read Defendant his *Miranda* rights in the presence of Defendant's mother prior to any questioning about the murder.  Carroll denied having any discussions regarding the outcome of the case, and he denied making any promises in exchange for a statement. Carroll also denied threatening Defendant to induce him to provide a statement.  The detective testified that Defendant and his mother signed the waiver of rights form, and that Detective Tommy Woods and Ken McCrary, a juvenile officer, also witnessed Defendant's signature.
>
> On cross-examination at the juvenile court hearing, Detective Carroll acknowledged that four or five other officers accompanied him to Defendant's home at the time of the arrest, that Defendant was taken

5

separately from his mother to the police service center, and that Defendant did not have an opportunity to confer in private with his mother prior to his interview. Furthermore, the detective stated that he had a conversation with Defendant before he turned on the tape recorder to record the statement, but not before he read Defendant his *Miranda* rights.

Defendant's mother testified that on the day of his arrest, her son opened the door, saw the officers, and said he would get his mother. According to Ms. Blocker, officers followed Defendant back into the house and told Defendant that they were taking him in for questioning about a murder. They told Ms. Blocker, while in her son's presence, that she needed to come to the police service center because she "knew about" the crime and "could also be arrested."

When asked "at what point [Defendant] was read his Miranda rights in the interview room," Ms. Blocker replied, "After Tim Carroll told him if he bullshitted him, he'd make sure he'd get the g__d___ chair and my son said, okay, I'll tell you what you want to know." Ms. Blocker also testified, "In my presence the man just kept saying that he know [sic] what happened and that I knew what happened and if he kept– if he kept– if my son bullshitted him, he'd make sure he got the chair and he kept cursing my son." She stated that the *Miranda* rights waiver form "was read as the man was writing out the thing," and she affirmed that Defendant acknowledged on tape that he had signed the waiver. When asked on tape whether they had been threatened, neither Defendant nor his mother stated that threats had been made.

Defendant also testified at the juvenile suppression hearing. He stated, 'When we came out of the house [on the night of arrest], Detective Tim Carroll pulled me away from a female officer and took me across the street and he said what do you know about the cab driver murder. I said I don't know nothing. He said before this night is over your g__d____ ass is going to know something and he took me back over there to her, to the female officer.'

He affirmed that officers told his mother 'she could be arrested for knowing something about the murder.' Defendant stated that he signed the rights waiver '[a]fter Tim Carroll kept like making his little threats about the electric chair.' He stated that no one read the form to him, that the threats scared him, and that he would not have made a statement to police had he not been threatened with the electric chair.

Defendant testified, 'First, [Carroll] asked me, asked me my story. After he wrote all of that down, he told me–had me to sign it and he didn't read it off to me or nothing, asked me to sign it.' He claimed that his *Miranda* rights

6

were read to him for the first time on the tape recording, after he had given his version of events and signed the waiver. He admitted that he had an opportunity to read the waiver before he signed it, but stated that he did not because he was 'too busy' and 'thinking about the threats [Carroll] made and thinking about 'his mama and [his] sisters.' Finally, Defendant acknowledged that he stated on the tape recording that he understood his rights, waived his right to a lawyer, and waived his right to remain silent.

*State v. Blocker*, 1999 WL 124223, at *1-3 (Tenn.Crim.App. 1999).

### B. <u>Facts from Post-Conviction Hearing</u>

The facts from the state post-conviction evidentiary hearing are taken from the decision of

the appellate court:

At the evidentiary hearing, Philip Duval, who was retained by the petitioner after the transfer from the juvenile court to the criminal court, testified that the petitioner was represented by attorney Mark Rothberger in the juvenile court. He stated that he filed a motion to suppress the petitioner's pretrial statement to police, but was unsuccessful. He also noted that Attorney Rothberger filed a similar motion in the juvenile court that was also denied. Attorney Duval acknowledged that he did not present any expert psychological testimony at the hearing on the motion to suppress the statement, explaining that the report prepared by his expert, Dr. Eric Engum, contained information damaging to the defense. It was his testimony that Dr. Engum believed that the petitioner had the mental capacity to understand and waived his constitutional rights. He also testified that the petitioner not only admitted killing the cab driver to the police, but confessed to two other individuals that he had committed the murder.

Attorney Duval acknowledged that he did not cross-examine a number of witnesses for the state. He testified that he advised the petitioner against testifying and that the petitioner agreed with the advice. Attorney Duval explained that he did not call Dr. Engum as a defense witness because there was unfavorable information in his report. It was his recollection that Dr. Engum found that while the petitioner had disorganized thought processes, he also exhibited threatening, harassing, and physically aggressive behavior. Dr. Engum also reported that the petitioner 'appreciate[d] the gravity and nature of the charges against him, underst[ood] the range and nature of possible penalties and [was] capable of appraising likely outcomes." Attorney Duval pointed out that Dr. Engum's testing of the petitioner did not 'indicate he suffer[ed] from mental disease or defect, the severity of which would qualify him for [an insanity defense].'

Jeanette Blocker, the petitioner's mother, testified that she was not called as a witness during either the trial or the sentencing hearing. She stated that the petitioner was removed from her custody at age one and was not returned to her until he was nine. It was her testimony that the petitioner experienced academic and behavioral difficulties throughout his life and had been placed in at least five separate juvenile detention facilities. Ms. Blocker recalled that the petitioner had an argument with the boyfriend of Janie Jones, who was a witness for the state, just prior to the crimes. Ms. Blocker conceded that she was present when the petitioner was questioned by police and admitted his involvement in the shooting. She stated that the petitioner had to carry a weapon for protection because he "wore blue. We live in Alton Park. Everybody in Alton Park wear[s] red."

The petitioner testified that his conviction was 'a big conspiracy from the DA on down to the judge to the witnesses.' He added, '[I] never had a chance to plead my case before no body . . . I had trusted [my attorney] on my life in his hands, and I have lost my life because of [him].' The petitioner contended that Attorney Duval deprived him of the right to testify and never explained that he had a constitutional right to testify. He stated that he never intended to rob the cab driver and claimed that he only walked back toward the cab to avoid walking through a ravine filled with 'wild dogs.' The petitioner claimed that when he neared the cab, he saw the driver reaching under the seat and then warned him to 'stop reaching.' The petitioner admitted that he shot the victim in the face when he failed to heed the warning. He argued that the area where the shooting took place was not a secluded area, but a residential area and called the prosecutor 'a big liar,' explaining that he and his co-defendants had called the cab only to avoid the 'wild dogs' which had 'rabies [or] the mange.

The petitioner acknowledged that the state offered a plea agreement whereby he would received a sentence of life with the possibility of parole in exchange for his testimony against his co-defendants. He stated that he did not accept the deal because he know 'how the state ma[d]e plea bargains . . . [They] go back and change things once you put your signature on it.' During cross-examination, the petitioner refused to answer a number of questions posed by the prosecutor, proclaiming that the prosecutor was on trial. When the prosecutor asked the petitioner if he had placed a gun to the head of the victim and had blown 'the face off' the victim, the petitioner responded 'Perhaps." Ultimately, the petitioner admitted that he was guilty of murder, but denied that he was guilty of first degree murder. While acknowledging that he had a problem with anger management, he claimed that he could be rehabilitated.

*Blocker v . State*, 2003 WL 934245 (Tenn.Crim.App. 2003).

V.       **ANALYSIS**

A.       **Denial of Motion to Suppress**

Petitioner raised two issues under his claim regarding the denial of his motion to suppress. First, petitioner contends his motion to suppress should have been granted because law enforcement failed to advise him of his *Miranda*[3] rights prior to extracting his initial statement. Thus, argues petitioner, his statement was obtained in violation of his rights under *Miranda*. Second, petitioner contends that after being intimidated and threatened by Detective Carroll he gave a statement about the murder. The Court will address these claims separately.

1.       **Violation of *Miranda***

According to petitioner, after he gave an oral statement to Detective Carroll, Detective Woods returned to the interview room with a tape recorder and petitioner repeated his statement for a second time and both detectives took notes. Petitioner maintains that law enforcement did not present him with a rights waiver until after this second statement. In addition, petitioner argues the trial court should have given his mother's testimony more credibility and its failure to do so resulted in an erroneous finding that there was no questioning prior to the *Miranda* warnings.

Statements stemming from a custodial interrogation of a criminal defendant may not be used by the prosecution unless it can be shown that the defendant was aware of his rights under the Fifth Amendment prior to questioning. *Miranda v. Arizona*, 384 U.S. 436 (1966). Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or

---

[3]       *Miranda v. Arizona*, 384 U.S. 436 (1966) (Prior to questioning initiated by law enforcement officers, after a person has been taken into custody or otherwise deprived of his freedom, the person must be warned of specific constitutional rights prior to interrogation).

9

otherwise deprived of his freedom in any significant way. *Id.* at 443-455. Petitioner was clearly in custody in the instant case; thus, the safeguards announced in *Miranda* were required.

A review of the trial court's decision denying the motion to suppress is supported by the evidence from the suppression hearings. The Court will not review all of the facts here. However, defendant's claim that he gave two statements prior to receiving the *Miranda* warnings is not supported by the record. Although his mother's criminal court suppression hearing testimony supports his version of what transpired at the police service center, her juvenile court testimony does not support his assertion that *Miranda* warnings were not given until after he gave two statements. The trial court apparently did not credit the testimony of petitioner's mother due to the inconsistency in her statements; a determination that, based on the record, is reasonable.

The detectives testified they read petitioner the *Miranda* warnings prior to him giving a statement. After the *Miranda* warnings were given to petitioner, he gave a statement and the detectives took notes. The detectives subsequently turned the tape recorder on to tape his statement. The trial judge was the trier-of-fact deciding between two somewhat differing accounts of what transpired. He heard the testimony first-hand, saw the witnesses, and concluded the detectives gave petitioner the *Miranda* warnings prior to interrogating him. The record before this Court, as well as the transcription of petitioner's confession, supports this conclusion. The trial court denied the motion to suppress in a detailed oral opinion that is free of constitutional error on this issue [Addendum No. 4, at 139-45]. The following discussion will explain why the trial court's decision to deny the motion to suppress is supported by the evidence and why this Court finds it reasonable.

Examining the conflicting testimony on the *Miranda* issue, the juvenile court and the trial court made a factual finding that the *Miranda* warnings were administered to petitioner prior to any

questioning *State v. Blocker*, 1999 WL 124223, at *3 (Tenn. Crim.App.), *perm. to app. denied*,

(1999) [Addendum No. 4, at 142]. The appellate court analyzed the waiver of constitutional rights

by juvenile criminal defendants in the manner the Tennessee Supreme Court discussed in *State v.*

*Callahan*, 979 S.W.2d 577 (Tenn. 1998). The appellate court analyzed the juvenile waivers under

a totality-of-the-circumstances test which requires consideration of six factors: (1) all circumstances

surrounding the interrogation including the age, experience, education and intelligence of the

juvenile's; (2) the capacity of the juvenile to understand the *Miranda* warnings and the consequences

of waiver; (3) the ability of the juvenile to read and write in the language used to give the warnings

and the juvenile's familiarity with *Miranda* warnings; (4) any intoxication; (5) any mental disease,

disorder, or retardation; and (6) the presence of a parent, guardian or interested adult. *Id.* at 583.

The appellate court analyzed the claim as follows:

> Regarding appellate review of a trial court's denial of motions to suppress
> evidence, our supreme court advised,
>
> > Questions of credibility of the witnesses, the weight and value of the
> > evidence, and resolution of conflicts in the evidence are matters
> > entrusted to the trial judge as the trier of fact. The party prevailing
> > in the trial court is entitled to the strongest legitimate view of the
> > evidence adduced at the suppression hearing as well as all reasonable
> > and legitimate inferences that may be drawn from the evidence. So
> > long as the greater weight of the evidence supports the trial court's
> > findings, those findings shall be upheld. In other words, a trial
> > court's findings of fact in a suppression hearing will be upheld unless
> > the evidence preponderates otherwise. . . . Hereafter, the proper
> > standard to be applied in reviewing suppression issues is the
> > "preponderance of the evidence" standard.
>
> *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).
>
> From the above recitation of the facts, we find that the trial court properly
> considered the totality of the circumstances surrounding the interrogation
> when making the decision to deny Defendant's motion to suppress.
> Furthermore, we conclude that the evidence does not preponderate against

11

the trial court's denial. Where the trial judge found conflicts among the statements by Detective Carroll, Defendant, and Ms. Blocker, he appeared to resolve them in favor of Detective Carroll, which was reasonable and not improper in his role as the trier of fact. This issue lacks merit.

*State v. Blocker*, 1999 WL 124223, at *3 (Tenn.Crim.App.1999).

The Court's first inquiry is whether Detective Carroll advised petitioner of his *Miranda* rights prior to petitioner making a statement. Examining the conflicting testimony on the issue, the state post-conviction court made a factual finding that the *Miranda* warnings were administered to petitioner prior to him giving a statement. Given the credibility assessment required to make such a determination and the deference due to state court factual findings under AEDPA, the Court finds the trial court's finding was reasonable. The facts in the state court record support the state court's factual findings and credibility findings. There were two suppression hearings, one in juvenile court and one in criminal court. Petitioner testified only in the juvenile court hearing while petitioner's mother testified in both hearings. The juvenile court transcript was filed in the criminal court suppression hearing and made a part of that record.

During the juvenile court suppression hearing petitioner's mother testified that Detective Carroll read petitioner his *Miranda* Rights after Detective Carroll told petitioner if he "bullshitted him" he'd make sure he received the electric chair. According to petitioner's mother, after that statement was made, petitioner said he would tell Detective Carroll what he wanted to know [Addendum No. 2, at 94]. In addition to testifying that the *Miranda* rights were read to her son, she also testified that after they signed the paper, the officers had petitioner give his statement before activating the tape-recorder [Addendum No. 2, at 94-96]. This testimony is consistent with Detective Carroll's testimony but inconsistent with the testimony petitioner's mother subsequently gave at the criminal court suppression hearing. A copy of petitioner's signed waiver document and

the transcription of petitioner's statement is included in the record [Addendum No. 4, Exhibit No. 2]. The Court observes that when the tape recorder was turned on, the officer stated that he had read petitioner his constitutional rights and then he read them again and petitioner acknowledged that he understood his rights. In addition, Detective Carroll verified on tape, according to the transcript of the interview, that petitioner signed the waiver form on October 23, 1995 at 10:43 p.m. and said to petitioner, "[t]hat was before we started talking is that correct[?]" Petitioner responded, "[y]es."

The testimony of petitioner's mother changed from the time of the juvenile court suppression hearing to the criminal court suppression hearing. During the criminal court suppression hearing the trial court heard two different accounts of what transpired prior to petitioner's statement–petitioner's account and law enforcement's account. In addition, the transcript from the juvenile court hearing was made part of the criminal court suppression hearing. Looking first to petitioner's account of what transpired, the Court will briefly review the testimony presented on his behalf during the suppression hearing in state criminal court and juvenile court.

Petitioner's mother testified at the criminal court suppression hearing that once she arrived at the Police Service Center she and petitioner were escorted into a room. They were in the room with Detective Carroll and Detective Woods initially, but Detective Woods left to find the juvenile officer, Officer McCrary. According to petitioner's mother, while they were alone in the room with Detective Carroll, "[h]e told [her] that he knew what [her] son had did and that if my son bullshitted him, he'd make sure he got the goddamn chair." [Addendum No. 4, at 16-17]. Petitioner's mother further testified that Detective Carroll told her "that my child was in harm, they were going to try - - they were going to try to have my baby electrocuted" Petitioner's mother maintained that Detective Carroll "told my baby, if you tell me what I want to know, I'll go to the Judge and I'll talk

13

to the Judge and tell him that you cooperated and I'll do, you know, what I can for you." At that time, petitioner and his mother looked at each other and she " told him to do what he had to do. He said, okay, I'll tell you what you want to know, then he told Tim Carroll what he had to say." According to petitioner's mother, this occurred prior to Detective Woods returning to the room [Addendum No. 4, at 18-19].

According to petitioner's mother, when Detective Woods returned to the room Detective Carroll informed him petitioner was going to give a statement, so Detective Woods left to obtain a tape recorder. Upon his return, petitioner gave a statement as Detective Woods took notes. Inconsistent with her testimony at the juvenile court suppression hearing, petitioner's mother testified that subsequent to petitioner giving Detective Woods the statement where Detective Woods took notes, Detective Carroll completed the waiver form and had petitioner and his mother sign it. Detective Carroll allegedly stated that since petitioner was going to give a statement, they needed to sign the waiver form and they both signed it without reading it and without it being read to them. Petitioner's mother testified that the only time the rights were read, was when the tape recorder was turned on [Addendum No. 4, at 20-24].

On cross-examination petitioner's mother admitted that at the juvenile court hearing she testified the *Miranda* warnings were given after Detective Carroll told petitioner if he b___s_____him, he'd make sure he got the electric chair and petitioner agreed to tell him what he wanted to know. However, petitioner's mother stated that when she answered the question in juvenile court, she did not understand the question.

Petitioner also presented testimony on his own behalf during the juvenile court suppression hearing. When petitioner was asked at what point he signed the rights waiver form he responded:

14

> After Tim Carroll kept like making his little threats about the electric chair. Basically I signed it right after he wrote all the stuff down and I was signing it, he didn't read it to me, he just gave it to me. He said we was going to put it on tape. At that time Tommy Woods, Detective Woods was setting everything up for the tape recorder.

[Addendum No. 2, at 101].

Petitioner testified that when he was taken into the interview room Detective Woods starting naming people that law enforcement claimed had told them petitioner was involved in the murder. On cross examination petitioner maintained that he was alone with the officers when they identified the people who had spoken with them about this crime [Addendum No 2, at 101-03].[4] In addition, according to petitioner, his rights were not read to him prior to the initial questioning. Furthermore, he testified it was not until after he had given the second statement, the statement where the officers took notes, that he signed the waiver which he claims he did not read [Addendum No. 2, at 104-06]. Petitioner did not testify at his criminal court suppression hearing; he relied upon his testimony contained in the juvenile court transcript.

Detective Carroll testified during the juvenile court suppression hearing that petitioner was picked up at approximately 9:30 p.m. Detective Carroll left petitioner's residence and at 9:41 p.m. Detective Carroll took Calvin Trammell into custody. The third suspect was taken into custody at 10:01 p.m. Detective Carroll and Detective Woods then returned to petitioner's residence to transport his mother to the police service center. At 10:41 p.m. Detective Carroll verbally advised

---

[4] That testimony contradicts his mother's testimony during the suppression hearing conducted in criminal court where she testified that as soon as she arrived at the police service center with Detectives Carroll and Woods, she and her son were escorted into the interview room [Addendum No. 4, at 16].

petitioner of his *Miranda* rights.[5]  Detective Carroll denied questioning petitioner prior to reading

him his *Miranda* rights [Addendum No. 2, at 9-14; Addendum No. 4, at 71-72].  Detective Carroll

acknowledged that after reading petitioner the *Miranda* warnings, he interviewed petitioner and took

notes prior to recording petitioner's statement.  Petitioner's tape recorded statement began at 11:08

and concluded at 11:25 p.m. [Addendum No. 2, at 40].

Given the credibility assessment required to make such determination and the deference due

to state-court factual findings under AEDPA, this Court finds the trial court's finding was reasonable

under § 2254(d)(2).  Accordingly, the appellate court's rejection of this claim was neither contrary

to or an unreasonable application of the governing legal principles in Supreme Court cases, nor an

unreasonable determination of the facts.  A writ of habeas corpus will not issue based on petitioner's

claim that his statement should have been suppressed because law enforcement failed to advise him

of his *Miranda* rights prior to extracting his initial statement.

### 2.    <u>Involuntary Waiver</u>

Petitioner's second claim under his suppression issue is that his confession was not the result

of an intelligent and voluntary waiver of his rights.  Petitioner maintains that he signed the waiver

because he was scared after being threatened with the electric chair.  Petitioner contends that his

confession was the result of threats and intimidation and the Tennessee Courts failed to analyze this

claim under the proper standards established by Tennessee law.  Apparently, petitioner claims that

Rule 7(d) of the TENNESSEE RULES OF JUVENILE PROCEDURE was violated.  Rule 7(d) provides:

> Interrogation.  Intimidative or coercive methods shall never be used in
> questioning children.  If feasible, a parent or guardian should be present

_____

[5]      This testimony is supported by petitioner's waiver of rights form [Addendum No. 4,
Exhibit 2].

during questioning.  In any event, no child having been placed in and present in a detention facility shall be interrogated concerning an alleged violation of law unless the child intelligently waives in writing the right to remain silent.

To support his claim that his statement was not the result of an intelligent and voluntary waiver of his rights, petitioner first claims that Detective Woods and Detective Carroll threatened his mother with arrest and this caused the petitioner to worry about his mother when deciding whether or not to give a statement.  Petitioner, who was seventeen at the time he committed these crimes, complains that he was separated from his mother when police arrived at his residence.  According to petitioner, Detective Carroll escorted him to a waiting patrol car and told him that "before this night is over your g__d____ ass is going to know something" [Court file No.3, at 10].  And lastly, petitioner contends he was threatened with the electric chair if he "bullshitted" Detective Carroll.

Petitioner maintains that the threats prevented him from reading the rights waiver and unduly influenced him to confess.  Other factors he contends contributed to the "duress of the situation" included the fact that his sister, who had recently been raped, became hysterical when the police arrested him.  Petitioner also argues he did not have the ability to read the waiver because he could only read at a third grade level and functions at an intellectual level barely above the mental retardation level.  Finally, petitioner contends he was under duress because law enforcement failed to allow him a meaningful opportunity to consult with his mother.  Petitioner argues that the state court erred in failing to suppress his confession and erred in failing to given any "recognition to the testimony of Ms.Blocker and her son."  In conclusion, petitioner maintains that his confession was not the result of a knowing, intelligent, and voluntary waiver, but rather, a coerced confession from

a person who lacked the ability to read, who was confused and frightened, and who was without parental consultation or guidance.

On direct appeal petitioner claimed the trial court erred by denying his motion to suppress his pretrial statement to law enforcement because the officers failed to advise him of his *Miranda* rights prior to him making a statement and that the waiver was not voluntary, knowing and intelligent, but rather, the product of coercion and intimidation. The state appellate court affirmed the denial of the motion to suppress by the juvenile court and criminal court concluding that the evidence does not preponderate against finding that petitioner's waiver was voluntary, knowing, and intelligent. *See State v. Blocker*, 1999 WL 124223, at *1-2 (Tenn.Crim.App.), *perm. app. denied* (1999).

The appellate court reviewed both the juvenile court and criminal court findings. First, the appellate court observed that the juvenile court judge stated she did not find evidence of coercion and force so as to render the waiver of rights involuntary. In addition, she stated,

> I think there is a logical time frame laid out in this that supports the testimony of the officer and [is] also supportive of the testimony of these parents over here. . . . I don't find anything inconsistent with the State's testimony and I find nothing offered by the defendants on this through their witnesses to believe that these were anything other than voluntarily obtained by the officers in the course of this investigation that night.

> The trial court denied the motion to suppress, making several findings: (1) the defendants were properly arrested; (2) the requests made of the parents and guardians to be present were proper; (3) statements made to Ms. Blocker regarding her possible knowledge of the facts were not coercive in nature; (4) the procedure in the interview room and police service center hallways was extremely reasonable, timely, and not coercive; (5) no questioning took place prior to proper admonitions under *Miranda*; (6) the time sequence between the rights offerings and the actual taping of the statements was extremely reasonable; (7) the interviewing between individuals was reasonable and very understandable; and (8) the officers were not required to inform the parents of their function to advise their children during the interviewing process.

18

*State v. Blocker*, 1999 WL 124223, *3 (1999).

The appellate court correctly observed that the credibility of the witnesses is a matter entrusted to the trial judge as the trier of fact. Furthermore, the Court agrees with the appellate court's assessment of the trial court's finding that where the trial judge found conflicts among the statements by the witnesses, he resolved them in favor of the prosecution, which was reasonable and proper in his role as the trier of fact. The appellate court affirmed the trial courts conclusion that petitioner was not coerced into making a statement but rather, his statement was voluntary.

There is no credible evidence in the record that demonstrates petitioner's statement was not voluntary. Consequently, petitioner has failed to demonstrate that the state court decision was contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts. Under 28 U.S.C. § 2254(d), this Court must defer to a state court's factual finding, absent clear and convincing evidence to the contrary. Petitioner complains that the trial court failed to give any weight to his or his mother's testimony. However, the trial court must make credibility determinations when making its factual findings and this Court is bound by the state court's factual findings in this case because petitioner has failed to provide clear and convincing evidence that the state court's findings were unreasonable. Furthermore, the record fully supports the state court's findings. Therefore, this Court finds the state court's finding that there was no coercion and petitioner's statement was voluntary is correct and reasonable. The petitioner does not cite to a Supreme Court case which demonstrates the state court decision was contrary to or an unreasonable application of the governing legal principles in Supreme Court cases. Habeas corpus relief is not available on this claim.

B.      **Denial of Fair Trial**

19

Petitioner contends he was denied a fair trial when Terry Smith, the victim's niece, was permitted to testify that her uncle normally carried a wallet and to her knowledge, members of her family had not received this wallet from the hospital, the police, or the Mercury Cab Company (the victim's employer). Smith also testified she did not see her uncle that day and that she herself had not been the recipient of her uncle's belongings. She also confirmed that other items, such as one of his shoes and socks were never recovered.

Petitioner contends this testimony was speculative because there was no evidence that her uncle was carrying the wallet on the day of the murder or how much money he had. Furthermore, argues petitioner, there is evidence in the record that the wallet was recovered by law enforcement.[6] Petitioner contends there was no other evidence of theft in the record and allowing this evidence denied him of his right to a fair trial.[7]

The appellate court determined the evidence did not establish that the victim habitually carried a wallet; however, the appellate court determined the evidence was relevant and its admission by the trial court was not improper. *State v. Blocker*, 1999 WL 124223, *5-6. The

---

[6] Petitioner is correct that the record does contain evidence that the wallet was recovered. During the motion to suppress in criminal court, Detective Carroll testified that they found money in the victim's wallet and agreed that would indicate money had not been removed from the wallet [Addendum No. 4, at 100].

[7] Although the appellate court, when discussing the admission of Terry Smith's testimony stated "[t]he issue is significant because no other evidence of theft exists in the record to support a conviction for especially aggravated robbery," *State v. Blocker*, *5, they did not determine that there was no evidence of an attempted aggravated robbery. In addition, there was proof that a theft was attempted; a witness testified that petitioner told him when he and his co-defendants got out of the taxi, one of them demanded the taxi driver give him his money [Addendum 3, at 47]. In addition, petitioner's statement was introduced during trial and in his statement to the police he admitted that one of his co-defendants was demanding money from the cab driver and when the cab driver started digging in the side of the seat petitioner ran back to the vehicle and put his gun to the cab drivers head [Addendum No. 4, Exhibit 2].

20

appellate court observed that in situations where evidence is admitted and claimed to be error no relief will be granted unless a substantial right of the party is affected, and only if a timely objection or motion to strike appears in the record, stating the specific ground of objection if the specific ground was not apparent from the context. In this case, the appellate court determined that no substantial right of petitioner's was affected and the trial court did not abuse its discretion by admitting the testimony of Terry Smith. However, the state appellate court did find that the testimony, that no wallet was recovered during the investigation, was insufficient to permit the jury to find a theft had occurred.

The Court lacks authority to revisit the state courts application of Tennessee evidentiary law to the facts of this case because petitioner was not denied a fundamentally fair trial by the inclusion of Terry Smith's testimony regarding the victim's wallet. Evidentiary rulings can be the basis for federal habeas corpus relief only when they denied the defendant a fundamentally trial. Petitioner has not demonstrated that the inclusion of the evidence denied him of a fundamentally fair trial. *See Estelle v. McGuire,* 502 U.S. 62, 67 (1991), *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994). The state courts found no violation of state law and the record supports the state court's findings. Without a finding of a fundamentally unfair trial in violation of due process, and no proof of actual prejudice, the Court finds no merit to this claim.

Accordingly, the state court's rejection of this claim did not stem from an unreasonable determination of the facts and was not contrary to or an unreasonable application of relevant Supreme Court precedent. The writ cannot issue with respect to this claim.

Intertwined with this claim, is a claim regarding the sufficiency of the evidence to support the especially aggravated robbery count. Petition contests the appellate courts decision to modify

his sentence rather than set it aside and argues the appellate court should have refrained from substituting its judgment on a matter reserved for the province of the jury.

The appellate court determined the evidence was insufficient to sustain a conviction for especially aggravated robbery and modified his conviction to attempted especially aggravated robbery finding the felony murder conviction was well supported by proof that petitioner committed an attempted especially aggravated robbery. The appellate court determined Smith's testimony and the testimony of an investigative officer that no wallet was recovered during the investigation was insufficient to permit the jury to find a theft had, in fact, occurred. Since a conviction by a jury for a greater offense necessarily includes a finding of guilt on each element of a lesser included offense, the appellate court modified petitioner's conviction for especially aggravated robbery to attempted especially aggravated robbery. Thus, they upheld the felony murder conviction by finding that the evidence was more than sufficient to find that the murder was committed during the perpetration of an attempted especially aggravated robbery. The record supports this conclusion

The appellate court then conducted a *de novo* review of petitioner's twenty-two year, Range I offender, consecutive sentence which he received on the especially aggravated robbery conviction. TENN. CODE ANN. § 40-35-402 (c) and (d) provides that when a petitioner appeals his sentence the court should conduct a *de novo* review with a presumption that the determinations made by the court from which the appeal is taken are correct. TENN.CODE ANN. § 40-35-401(d). The statute gives the appellate court the authority to dismiss the appeal; affirm, reduce, vacate or set aside the sentence imposed; remand the case or direct the entry of an appropriate sentence; or direct any further proceedings.

22

On direct review the appellate court used "the same criteria to determine the appropriate modification of [petitioner's] sentence in conjunction with [their] modification of his conviction from especially aggravated robbery to attempted especially aggravated robbery." *State v. Blocker*, at *9. The appellate court reviewed the trial court's sentencing decision to provide guidance when they re-sentenced petitioner:

In this case, the trial court found that the range for especially aggravated robbery was fifteen to twenty-five years, and that sentencing considerations for this offense should begin at the mid-point of the range, twenty years. *See* Tenn. Code Ann. § 40-35-210(c). In addition, the trial judge first found that enhancement factor one–that '[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range'–was applicable. *See* Tenn. Code Ann. § 40-35-114(12). Although he did not consider Defendant's prior crimes to be 'major offenses,' he found that the crimes were concentrated in a very short period of time–between the ages of fourteen and eighteen. He therefore increased Defendant's sentence from the twenty-year mid-point to twenty-two years.

Next, the trial judge rejected enhancement factors two and eight–that '[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors" and that '[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community,' respectively. *See id.* § 40-35-114(2), (8). The judge noted that he did not find 'any significant basis' to support a determination that Defendant was the leader in commission of the robbery, despite the fact that Defendant shot the victim. Furthermore, he declined to find any significant history of unwillingness to comply with conditions of release because Defendant committed the offense as a juvenile, and all previous criminal convictions were from the juvenile court.

The trial judge then considered and rejected the three mitigating factors presented by Defendant. First, the judge found mitigating factor two–that '[t]he defendant acted under strong provocation'–inapplicable because this case did not 'involve a theft case where an individual is stealing food for his family,' and because he found no other proof of provocation in the record. *See id.* § 40-35-113(2). Next, he rejected mitigating factor eight, that '[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense.' In support, the trial judge noted that he found nothing in the expert testimony presented

23

to indicate a disability within the meaning of this mitigating factor. Finally, although he noted that Defendant was seventeen years old at the time of the offense, he also found that the Defendant was 'streetwise,' and therefore 'considerably older' than seventeen. Thus, he rejected mitigating factor six, which states, 'The defendant, because of youth or old age, lacked substantial judgment in committing the offense."

*State v. Blocker*, at *9.

Taking the trial court's sentencing findings into account, the appellate court concluded the range for a standard offender convicted of attempted especially aggravated robbery, was a Class B felony which requires a sentence between eight and twelve years. In accordance with the Tennessee sentencing guidelines, the appellate court began at the minimum for the range and took into account the trial court findings, before sentencing petitioner to nine years as a standard range I offender for attempted especially aggravated robbery.

There is sufficient evidence in the record to support petitioner's conviction for attempted especially aggravated robbery and the nine year sentence. Not only does petitioner's own statement to law enforcement contain sufficient evidence to convict him of felony murder based upon attempted especially aggravated robbery, but so does the testimony of LaMichael Jones. Jones testified that sometime after the murder he accompanied petitioner to an area near the cemetery where petitioner retrieved a gun, wrapped in a plastic bag, from the sewer. After returning to petitioner's residence with the weapon, petitioner told Jones a cab was called on the night of the murder from the Big H Unistop; petitioner and his co-defendants entered the cab; upon exiting the cab one of them demanded the taxi driver's money; and after the second demand for money, petitioner shot the cab driver when he reached behind his back [Addendum No. 3, at 43-47].

Petitioner's convictions were supported by constitutionally adequate evidence. The testimony and identification of the weapon by LaMichael Jones along with the defendant's

24

confession and proof that the cab company received a call from Big H convenience store, where defendant said he and his co-defendants called a cab are sufficient to convict petitioner of felony murder based on an attempted especially aggravated robbery. In addition, Rondell Miree identified the alleged murder weapon and testified he was at petitioner's residence and petitioner gave him the firearm and told him he had shot the cab driver with it [Addendum No. 3, at 63]. Dr. King's testimony that the victim was shot in the head at close range was further corroboration of the petitioner's admission that he shot the victim at close range.

Petitioner has failed to direct the Court's attention to, and the Court is unaware of a Supreme Court case that prohibits the state court from making such a modification in this situation. Petitioner has not shown and the Court does not find that the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. Because he has failed to make the necessary showing, the Court declines to grant relief on this claim.

### C. Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel failed to subject the state's case to the adversarial process in violation of his constitutional right to effective assistance of counsel. Petitioner complains about his juvenile court and his criminal court counsel. The Court will address these as two separate sub-issues after identifying the law which applies to Petitioner's ineffective assistance of counsel claims.

Federal courts must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption only applies to underlying basic, primary, or historical facts, and

not to mixed questions of facts and law. *Rickman v. Bell,* 131 F.3d 1150, 1153 (6th Cir. 1997), *cert. denied,* 523 U.S. 1133 (1998);*West v. Seabold,* 73 F.3d 81, 84 (6th Cir.), *cert. denied,* 518 U.S. 1027 (1996). Ineffective assistance of counsel in a petition for habeas corpus review presents a mixed question of law and fact. *West v. Seabold,* 73 F.3d at 84. Therefore, a state court's conclusion counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254 (e)(1). State court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of 28 U.S.C. § 2254(e). However, the performance and prejudice components of the ineffectiveness inquiry, which are mixed questions of law and fact, are not entitled to the deference. *See Rickman,* 131 F.3d at 1153-54. To obtain relief, Petitioner must show the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established Federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *see also, Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004) (Stating that a claim of ineffective assistance of counsel presents a mixed question of fact and law, thus, requiring the application of the "unreasonable application" prong of § 2254(d)(1), the Sixth Circuit observed that "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable.'" (*quoting Williams v. Taylor*, 529 U.S. 362, 411 (2000)).

The Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious. To establish his attorney was not performing within the range of competence demanded of attorneys in criminal cases, the defendant must demonstrate the attorney's representation fell

below an objective standard of reasonableness. *Strickland,* 466 U.S. at 687-88; *McMann v. Richardson,* 397 U.S. 759, 771 (1970). The *Strickland* test requires that a defendant demonstrate two essential elements: (1) counsel's performance was deficient, *i.e.,* counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, *i.e.,* deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id.* at 687-88; *McQueen v. Scroggy,* 99 F.3d 1302, 1310-11 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997); *Sims v. Livesay,* 970 F.2d 1575, 1579-81 (6th Cir. 1992). S*ee also Flippins v. United States,* 808 F.2d 16, 17-18 (6th Cir.), *cert. denied,* 481 U.S. 1056 (1987). As the Sixth Circuit explained in *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied,* 508 U.S. 975 (1993): "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *See also West v. Seabold,* 73 F.3d at 84. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *West,* 73 F.3d at 84, *quoting Strickland,* 466 at 691, *citing Smith v. Jago,* 888 F.2d 399, 404-05 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990). There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689; *Sims,* 970 F.2d at 1579-80.

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell,* 126 F.3d 843, 847 (6th Cir. 1997), *cert. denied,* 523 U.S. 1079 (1998), *citing, Strickland,* 477 U.S. at 687; *United States v. Cronic,* 466 U.S. 648, 658, (1984); *McQueen v. Scroggy,* 99 F.3d at 1310-1311. The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context

27

of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690; *McQueen*, 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen*, 99 F.3d at 1311; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828. Effective assistance of counsel is presumed, and the Court will not generally question matters involving trial strategy. *See United States v. Chambers*, 944 F.2d 1253, 1272 (6th Cir. 1991), *cert. denied*, 502 U.S. 1112 (1992).

To establish the prejudice prong, petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), *quoting Strickland v. Washington*, 466 U.S. at 690. The Court must make an independent judicial evaluation of counsel's performance, and determine whether counsel acted reasonably under all the circumstances. *McQueen*, 99 F.3d at 1311; *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993); *Sims*, 970 F.2d at 1580-81.

The Court will now address each of the alleged instances of ineffective assistance of counsel.

### 1. Juvenile Court Counsel

Petitioner contends a reasonable probability exists that he would not have been transferred to Criminal Court , his motion to suppress his statement would have been granted, and he would not have been convicted as an adult and given a life sentence, if juvenile court counsel had been effective. Petitioner contends his juvenile court counsel was informed of his past emotional,

educational, and sociological problems and that his educational and probation records evidenced these problems, but counsel failed to introduce this information during his juvenile court hearing and counsel failed to argue petitioner's retardation during the hearing.

Rule 24 of the TENNESSEE RULES OF JUVENILE PROCEDURE provides the procedure for transferring a child to criminal court. Rule 24(4) provides:

> Unless the child appears in any way to be mentally ill or mentally retarded, and unless personally or through counsel, asserts that the child is mentally ill or retarded, it shall be presumed that the child is not committable to an institution for the mentally ill or mentally retarded, and the court may so find. If mental illness is alleged, the court shall order psychological or psychiatric examination at any stage of the proceeding.

The state trial court addressed this issue in its memorandum disposing of petitioner's state post-conviction petition:

> The petitioner complains that, despite his history of institutionalization for cognitive impairment or emotional disturbance, his counsel in the proceedings in juvenile court did not investigate his mental condition. Even if counsel's performance was deficient in this respect, however, there is not clear and convincing evidence that the deficiency was prejudicial. By order of the juvenile court, the petitioner underwent a mental examination to determine whether he were committable to an institution for the mentally retarded or mentally ill. The examiner(s) concluded that the petitioner was not committable to such an institution.
>
> In addition, neither the report of the petitioner's own mental health expert, Eric S. Engum, Ph.D., J.D., nor the references to his admissions to mental health institutions in the juvenile court records establish that, at the relevant time, the petitioner was committable. The 1992 admission, which was pursuant to an order of a referee of the juvenile court and was for the purpose of diagnosis and evaluation only, even resulted in a determination that, despite his "acting-out/conduct problems[,]" the petitioner was not mentally retarded, mentally ill, or civilly committable. (Exhibit 3, 15 October 1992 letter from Ms. Helen E. Chappell, Liaison Teacher Counselor, and Dr. Dolorosa B. Yap, Psychiatrist, to the Honorable Bruce Owens, Referee of the Juvenile Court of Hamilton County, Tennessee). Regarding the other two admissions, both of which, one in 1989 and the other in 1993, were brief, the only information there is [sic] comes from Dr. Engum's report and the

29

reference to "acute hospital" in two statements from First Mental Health, Inc., which "reviews services for the Children's Plan of Tennessee[,]" respectively. (Exhibits 2, 5). Considering the evidence that the petitioner was not committable and the lack of evidence that he was committable, the Court finds that any omission on the part of counsel in this respect was not prejudicial.

[Addendum No. 5, at 7514-15].

The transfer hearing took place in Juvenile Court in December of 1995. The record reveals that on September 17, 1992, petitioner was admitted to Smallwood for diagnosis and evaluation. It was determined that he was "not mentally retarded or mentally ill, nor civilly commitable for inpatient psychiatric hospitalization or to the custody of Tennessee Department of Mental Health/Mental Retardation." [Addendum No. 6]. The evaluation revealed that petitioner did not suffer from any major emotional difficulties nor psychosis but rather, a clinical level of acting-out/conduct problems was reflected. In October of 1992, Petitioner resided at Deer Valley due to his "physical aggression, verbal aggression, oppositional defiant tendencies, multiple school suspensions and alleged sexual acting out. At the time, petitioner was attending school for six hours a day. He earned B's and C's while working at eighth grade level work. At the time, petitioner was taking Ritalin for hyperactivity and Desyrel for depression. In addition, petitioner revealed that he had been sexually abused on at least two occasions [Addendum No. 6, Exhibit No. 2].

In addition, on November 13, 1995, approximately one month prior to the Juvenile Court hearing, and in response to a November 2, 1995, Juvenile Court order, a transfer evaluation of petitioner was conducted. It was determined that petitioner was not committable to an institution for the mentally ill or mentally retarded [Addendum No. 6, Exhibit 1]. Dr. Engum, petitioner's expert, determined that although he had some learning disabilities, his Full Scale IQ was 81. Dr.

Engum did not find petitioner to be mentally ill, mentally retarded, or committable to an institution.

Although Dr. Engum stated that petitioner was a,

> [S]eriously emotionally disturbed young man with multiple social, psychological and legal difficulties. . . . [I]t does **not** appear that Mr. Blocker's psychological deficits and disabilities serve as the foundation for an insanity defense.. . . [The] results do not indicate that he suffers from a mental disease or defect, the severity of which would qualify him for the insanity defense. . . . It does appear that Mr. Blocker does possess the capacity to appreciate the potential criminal wrongfulness of his actions as well as his role in the social contract which governs our society. In addition, it does not appear that he suffers an impairment which would impair his ability to conform his conduct to the requirements of the law.

[Addendum No. 6, at Exhibit 5]. The record before this Court does not reveal that petitioner is mentally retarded or mentally ill. Moreover, the record does not reveal that a reasonable likelihood exists that the juvenile court judge would have denied petitioner's transfer to criminal court if juvenile court counsel had introduced his past emotional, educational or sociological problems. Therefore, any omission on the part of counsel for failing to introduce psychological evidence during the juvenile court hearing was not prejudicial.

Petitioner has failed to demonstrate that the state court's rejection of this claim was based on an unreasonable determination of the facts, or was contrary to or an unreasonable application of the governing legal principles in Supreme Court cases. A writ of habeas corpus will not issue on this claim of effective assistance of counsel in the Juvenile Court.

Petitioner also complains that Juvenile Court counsel failed to present any witnesses or evidence to show Petitioner's statement was coerced or that petitioner did not intelligently waive his right against self-incrimination. The Court has previously determined that petitioner's statement was not coerced and that petitioner knowingly and intelligently waived his constitutional rights when he gave law enforcement a statement. *See Supra Section V.A.* Consequently, petitioner has

failed to demonstrate that his statement was coerced or that he did not knowingly and intelligently waive his constitutional rights prior to giving law enforcement a statement. Furthermore, the state court determined that juvenile court counsel filed a motion to suppress and regardless of whether intimidation was a ground for the motion, petitioner was not entitled to any relief because he had raised this claim at the trial and appellate level on those grounds and had been denied relief; thus, the omission was not prejudicial. The state court's rejection of this claim did not stem from an unreasonable determination of the facts and was not contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, respondent will be **GRANTED** summary judgment on the claim that counsel was ineffective during juvenile court proceedings, and this claim will be **DISMISSED**.

### 2. Ineffective Criminal Trial Counsel

Petitioner raises four separate claims against his trial counsel. Petitioner contends that had he received effective assistance of trial counsel that a reasonable probability exists that he would have never been convicted of the felony murder and attempted especially aggravated robbery. The Court will address the four claims separately.

### a. Ineffective Argument that Petitioner was Threatened with the Electric Chair

Petitioner contends trial counsel failed to present an effective argument to demonstrate threatening the petitioner with the electric chair was police misconduct. Counsel pursued the intimidative effect of the detective's references to the death penalty. Counsel presented evidence that petitioner alleged Detective Carroll threatened him with the electric chair and Detective Carroll denied making such threats. Examining the conflicting testimony on the issue, the trial court obviously credited Detective Carroll's testimony. Given the credibility assessment required to make

32

such a determination, *i.e.*, that his statement was voluntary, and the deference due to state-court factual findings under ADEPA, this Court cannot say the trial court's finding was unreasonable. However, petitioner failed to present this claim to the state appellate courts; thus, he has procedurally defaulted this claim. Absent a showing of cause and prejudice, this claim will be **DISMISSED**.

Accordingly, the respondent is **GRANTED** summary judgment on the claim that counsel failed to present an effective argument that petitioner was threatened with the electric chair.

### b. Failure to Present Evidence of Petitioner's Mental Health and Renew Suppression Motion

Petitioner contends his statement should have been suppressed because he did not intelligently and knowingly waive his constitutional rights prior to giving the statement. Petitioner contends counsel should have used Dr. Engums report and testimony to demonstrate his lack of intelligence and inability to understand the circumstances of the interrogation and the effect of signing the waiver.

The post-conviction court determined Dr. Engum's evaluation of the petitioner suggested that he was able to comprehend his rights and intelligently waive them. A review of Dr. Engum's report and the other mental health reports support this finding. The record reveals petitioner's mental health issues tend to be behavior oriented. In March of 1993, the report from Youth Villages reveals petitioner's identifying problems "were physical aggression, verbal aggression, oppositional defiant tendencies, multiple school suspensions, and alleged sexual acting out. His admitting diagnosis was Conduct Disorder, Undifferentiated and Parent-Child Problems" [Addendum No. 6, Exhibit 4]. Petitioner identifies Dr. Engum's findings of "gross retardation," "major impairments,"

and inability "to comprehend the meaning of words" to support his argument that he was unable to intelligently and knowingly waive his rights.

Although petitioner did not direct the Court's attention to the page on which these findings are located, they must be considered in the context in which they were made and within the context of the complete report. The discussion of gross retardation in Dr. Engum's report, described petitioner's thought processes as follows: "There were mild signs of disorganization, tangentiality and gross retardation in thought processes" [Addendum No. 6, Exhibit 5, at 2-3]. This information was included in a paragraph discussing petitioner's poor performance on sentence building tasks. Dr. Engum found that petitioner had a full scale IQ of 81, a verbal IQ of 81, and a performance IQ of 85. In addition, Dr. Engum judged his attention and concentration adequate for comprehending instructions and sufficient for carrying out tasks [Addendum No. 6, Exhibit 5, at 2]. There is nothing in Dr. Engum's report or in the record before this Court that suggests petitioner was unable to understand the constitutional rights he was waiving or the effect of waiving his constitutional rights.

Consequently, the record supports the state court finding that petitioner had the capacity to understand the constitutional rights he waived prior to giving his statement. The state court's determination that defendant voluntarily, intelligently, and knowingly waived his *Miranda* rights and gave a statement was not an unreasonable application of clearly established federal law to the facts, so as to warrant federal habeas relief, despite petitioner's claim that, in light of his subnormal intelligence, he lacked the ability to intelligently waive his rights against self-incrimination. There is clear evidence that the *Miranda* rights had been read to petitioner, that he understood them, that he understood the waiver, and that he signed the waiver and answered the questions voluntarily.

Accordingly, petitioner's claim that counsel should have renewed the suppression motion

and introduce Dr. Engum's report to demonstrate that he did not intelligently and voluntarily waive his *Miranda* rights will be **DISMISSED**.

### c.  Failure to Adequately Cross Examine Witnesses

Petitioner contends trial counsel failed to adequately cross-examine witnesses. Specifically, petitioner complains that counsel failed to cross-examine LaMichael Jones and failed to adequately question his mother, Janie Jones. Both parties testified petitioner admitted, to them, he shot the victim, and the petitioner, along with his co-defendants, had planed to rob the victim. Petitioner contends counsel should have questioned the witnesses to reveal that the weapon he used had at one time been in the Jones' possession and that Janie Jones had indicated she destroyed the weapon; bad blood existed between petitioner and the Jones family due to an argument they had prior to petitioner's arrest; there was a prior verbal altercation involving Janie Jones, her boyfriend, and petitioner; the possibility that the witnesses received a $10,000 reward; and that another son of Janie Jones had a murder charge pending in criminal court and the same assistant district attorney was prosecuting him.

Petitioner's claim that the weapon was previously in the Jones' possession or that Ms. Jones once claimed to have destroyed the weapon is a factually unsupported conclusion that does not demonstrate counsel was ineffective or that petitioner suffered any prejudice. Assuming the weapon was previously in the Jones' possession and Janie Jones stated she destroyed the weapon, that determination does not compel the conclusion that trial counsel's decision not to cross-examine the Jones about the weapon constituted constitutionally ineffective assistance of counsel. Moreover, there is no evidence that petitioner was prejudiced by counsel's failure to cross-examine the witnesses about their previous possession about the weapon.

Petitioner's factually unsupported statement that their was bad blood between him and the Jones' and that he was involved in a verbal altercation with Janie Jones and her boyfriend are conclusions that fail to prove counsel was ineffective or that petitioner suffered any prejudice because counsel failed to cross-examine the witnesses about the alleged "bad blood." Likewise, the possibility that the Jones received a $10,000 reward or that a relative had a murder charge pending with the same prosecuting attorney fails to demonstrate counsel was ineffective or petitioner suffered any prejudice. The Jones' testimony that petitioner admitted involvement in the crime supplemented the statement petitioner gave law enforcement admitting his involvement in the crime and the physical evidence at the crime scene *i.e.*, the murdered victim. Therefore, cross-examining the Joneses about their potential bias would not have created a reasonable probability of a different outcome at petitioner's trial.

Consequently, petitioner is not entitled to any habeas relief on his claim that counsel failed to adequately cross-examine state witnesses. Petitioner has neither demonstrated that the state courts' disposition of this claim was based upon an unreasonable determination of the facts presented to it, nor the state court's decision was an unreasonable application or contrary to well established federal law in Supreme Court cases. Accordingly, respondent is **GRANTED** summary judgement on petitioner's claim that counsel failed to adequately cross-examine witnesses, and this claim shall be **DISMISSED**.

### d.    <u>Failure to Present Defense</u>

Petitioner contends that counsel failed to present a defense during the guilt phase of his trial. Petitioner makes specific claims which the Court will address separately.

### i.    <u>Self-Defense</u>

36

First, petitioner makes an argument that sounds in self-defense. Specifically, petitioner contends he told the victim to "stop reaching" because he thought he was reaching for a weapon. However, the state argued he said "start reaching" to insinuate that petitioner was involved in the attempted robbery by telling the victim get his money. Petitioner claims that had counsel presented this alternative theory of the case, that he was telling the victim to "stop reaching" because he thought he was trying to grab a weapon, there is a reasonable likelihood that he would have been convicted of a lesser-included offense on the murder and would not have been convicted of robbery. The Court disagrees because petitioner's alternative theory was presented to the jury when his statement to authorities was introduced as evidence.

The state court addressed this claim, although rather vaguely, and determined that petitioner failed to present any favorable proof that his attorney could have offered at trial. The appellate court noted that during his post-conviction hearing petitioner admitted killing the victim and acknowledged he was guilty of murder. Petitioner also conceded that the details provided in his pretrial statement were true. The appellate court found petitioner was not denied ineffective assistance of counsel. The record supports this finding. Petitioner's statement, which was introduced at trial, provided the jury with petitioner's version of the facts. Petitioner's statement to the detectives, which was introduced to the jury explained,

> [The] cab driver began digging in the side of his seat then I ran over there, put the gun to his head. . . . Then _____ kept asking me, was I telling him to stop moving and didn't tell him and he kept reaching and I don't know if he was reaching for a gun, you know what I'm saying, a weapon or what.. . . And bout that time I shot him. . . . No [he never gave any money to [co-defendant] once he demanded the money]. He, [co-defendant] didn't have no, he [co-defendant] had no weapon, you know what I'm saying on him so I guess that what made the cab driver try to reach beside the seat and grab it. If he had a weapon grab his weapon and when up before, you know what I'm

saying, I was . . . I was scared, you know what I'm saying, cause I didn't know what they was doing and . . .

[I] told him to start reaching. . . . He was reaching through his head and I say start reaching between, you know what I'm saying, I was saying just start reaching. . . . I wadn't [sic] planning on shooting him or nothing. . . . He kept reaching[.]

[Addendum No. 4, Exhibit 2].

Petitioner's statement reflects his explanation that he thought the cab driver was reaching for a weapon. Consequently, an alternative theory of the case was presented to the jury. Although counsel, strategically decided it was in not in petitioner's best interest to testify, counsel still presented a defense on petitioner's behalf. During petitioner's state post-conviction hearing counsel testified there was little other evidence demonstrating a robbery and in the statement, petitioner denied he was participating in a robbery, but indicated he was acting in self-defense. Counsel testified the argument was petitioner willingly talked to the police and he told the truth about the shooting, thus, the rest of the statement is true too. Therefore, counsel argued they should acquit him of the robbery and felony murder. Consequently, petitioner is mistaken because counsel did present the defense that petitioner thought the victim was reaching for a weapon and trial counsel presented the self-defense argument without calling petitioner as a witness. Therefore, counsel presented the defense and petitioner is unable to demonstrate trial counsel was ineffective or that petitioner suffered any prejudice.

During the post-conviction hearing trial counsel testified that part of his strategy for not putting the petitioner on the stand was to prevent the things in Dr. Engum's report that would have been devastating to the petitioner from being used during the guilt/innocent phase of the trial [Addendum No. 6. at 82]. Also, counsel wanted to protect petitioner from cross-examination

[Addendum No. 6, at 84]. The Court observes that Dr. Engum noted that although petitioner has some difficulty with impulse control and anger management, he did possess the cognitive capacity to testify relevantly and respond to questions by the prosecution and his counsel. However, Dr. Engum cautioned:

> Though there may be some concern about unmanageable behavior under intense pressure, inappropriate behaviors were not observed during the present two-day evaluation.

[Addendum No. 6, Exhibit 4]. In addition, Dr. Engum noted petitioner's "long history of acting out behavior, poor anger control, impulsivity, and even some aggressive actions in response to mild stressors, frustrations, and problems in the environment" [Addendum No. 6, Exhibit #5]. There are other instances of unfavorable information in Dr. Engums report, all of which support trial counsel's decision not to utilize petitioner as a witness during trial.

The record reveals that during closing argument trial counsel asked the jury to decide the case based on petitioner's statement because that was the evidence and the prosecutor's speculations were not proof. Counsel also argued to the jury that petitioner thought the cab driver was reaching for a weapon [Addendum No. 3, at 311]. Counsel argued, to the jury, the only proof regarding petitioner's intent was in his statement and unlike the state suggested, they should not pick and choose what part of the statement to believe, but instead, should believe all of it or none of it.

Counsel's strategic decisions were reasonable and his decision not to have petitioner testify was reasonable and did not constitute ineffective assistance of counsel. Moreover, petitioner is unable to demonstrate prejudice. Thus, petitioner's claim that counsel was ineffective for failing to present his defense that the victim was reaching for a weapon will be **DISMISSED** and respondents motion for summary judgment will be **GRANTED** on this claim.

39

## ii.  **Wallet Evidence**

Next, petitioner contends counsel was ineffective for failing to introduce evidence from Detective Carroll's suppression hearing testimony, that the wallet was found with money in it, to counter the testimony of the victim's niece and a detective that the victim's wallet was never found. However, because the Tennessee Court of Criminal Appeals reduced petitioner's conviction for especially aggravated robbery to attempted especially aggravated robbery, the state courts found no prejudice resulted from counsel's performance. Since petitioner, in addition to his statement to the police admitting that he returned to the vehicle upon hearing one of his co-defendant's demanding the victim's money, also admitted to two witnesses who testified against him at trial that he returned to the vehicle after hearing one of his co-defendant's demanding the victim's money, the Court finds the record supports the state appellate courts' conclusion and petitioner has suffered no prejudice.

Accordingly, the state court's adjudication did not result in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, nor was the state court's decision based on an unreasonable determination of the facts in light of the evidence. Although counsel's performance was arguably inadequate in this regard, petitioner has not demonstrated that he was prejudiced by counsel's failure to bring out the contradictory testimony since the Appellate Court reduced petitioner's conviction to an attempt to commit an especially aggravated robbery.

## iii.  **Neighborhood Evidence**

Petitioner's last complaint is that counsel never challenged the characterization of the location of the crime as a secluded area. The post-conviction court addressed this issue and

determined that "[e]ven though counsel did not show the jury photographs of the crime scene, the state did so, and, even had it not done so, the presence of dwellings in the neighborhood would have been evident to the jury from other evidence." [Addendum No. 5, at 7517].

The Court observes that part of the trial testimony included testimony from a resident of Cain Street, the location the victim was directed to take the petitioner and his co-defendants. The witness was awakened when the Mercury cab landed on her front porch. The witness testified that there were wooded areas and Forest Hill Cemetery near her home [Addendum No. 3, at 18-19]. In addition, there was petitioner's statement that he was knocking on a residence where a friend lived which also provided evidence of dwellings in the neighborhood. Thus, the appellate court was correct that the presence of dwellings in the neighborhood was evident to the jury from other evidence.

Counsel's failure to offer photographs of the crime scene was not ineffective assistance of counsel and the respondent will be **GRANTED** summary judgment on this claim. Accordingly, petitioner's claim that counsel was ineffective for failing to provide evidence as to the characterization of the location of the crime scene will be **DISMISSED**.

## VI.   CONCLUSION

Respondent's motion to dismiss and for summary judgment [Court File No. 7] will be **GRANTED** as to all claims. Petitioner is not entitled to an evidentiary hearing, and his § 2254 petition [Court File No. 3] will be **DISMISSED**.

A judgment will enter.

_/s/ R. Allan Edgar_
R. ALLAN EDGAR
CHIEF UNITED STATES DISTRICT JUDGE

42